# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

JIMMY WOODARD,           :
                       :
      Plaintiff,         :
                       :
v.                         :     No. 5:09-CV-428 (CAR)
                       :
WAL-MART STORES EAST, LP,   :
                       :
      Defendant.       :
_____

## ORDER ON PLAINTIFF'S MOTION FOR SANCTIONS AND DEFENDANT'S

## MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court for the resolution of several motions: Defendant Wal-Mart's Motion for Summary Judgment [Doc. 26], Plaintiff Jimmy Woodard's Motion for Sanctions [Doc. 48], and Defendant Wal-Mart's Motion for Leave to File a Sur-reply [Doc. 58]. This is premises liability case based on a trip-and-fall accident that Plaintiff Woodard suffered in a Wal-Mart store. The central question is whether Plaintiff Woodard has produced sufficient evidence to create the necessary genuine issues of material fact as to Wal-Mart's liability in order to defeat Wal-Mart's Motion for Summary Judgment. The resolution of Plaintiff Woodard's Motion for Sanctions, in which he seeks sanctions for what he alleges was the spoliation of key evidence by Wal-Mart will figure prominently in deciding the summary judgment question.

Having considered the spoliation matter, the Court finds both that the circumstances surrounding the loss or disappearance of the security videotape of the area of the fall at the time of Plaintiff's fall are sufficient to support a jury finding of bad faith on Wal-Mart's part and that the loss of this videotape is prejudicial to Plaintiff's case. As a result, Plaintiff's Motion [Doc. 48] is

**GRANTED-in-PART**.  As explained below, if this case proceeds to a jury trial, the jury will be instructed that if it finds that Wal-Mart lost or destroyed the tape in bad faith, then there is a rebuttable presumption that the videotape contained evidence harmful to Wal-Mart on the issue of whether it had superior knowledge of the hazard.  To the extent Plaintiff's Motion requests sanctions for Wal-Mart's failure to retain the specific box of weights Plaintiff tripped over, Plaintiff's Motion is **DENIED-in-PART**.

The resolution of the Motion for Sanctions dictates that there is a genuine issue of material fact to be determined at trial as to the first prong of the premises liability analysis – whether Wal-Mart had actual or constructive knowledge of the hazard.  Furthermore, there is also a genuine issue of material fact as to the second prong – whether Woodard exercised ordinary care or whether any negligence on his part was the result of actions or conditions within Wal-Mart's control.  Thus, Wal-Mart's Motion for Summary Judgment [Doc. 26] is **DENIED**.

Wal-Mart also filed a Motion for Leave to File a Sur-reply Brief as to the question of sanctions [Doc. 58].  That motion is **DENIED**.

## I. BACKGROUND

This case concerns a trip-and-fall in a Wal-Mart store.  On the night of November 5, 2007, around 10:30 p.m., Plaintiff Woodard realized that his cell phone was missing.  When he called his own number to locate his phone, the voice on the other end confirmed his suspicion that he had left his phone in the automotive department of the Wal-Mart store located on Harrison Road in Macon, Georgia, when he had visited the store two or three hours earlier.  Having located his phone, Plaintiff Woodard and his friend Alan Bray made their second trip of the day to the store in order to retrieve the cell phone.

When they returned to the store, they entered through the general merchandise door and

headed toward the automotive department. As Plaintiff Woodard walked down a main aisle toward the automotive department, he observed two men that he believed were Wal-Mart employees standing roughly forty feet down the main aisle. One of the men raised a cell phone in the air and inquired whether Plaintiff Woodard was "looking for this?". The man then began walking down the aisle toward Plaintiff Woodard and Bray, holding the phone in the air.

Plaintiff Woodard continued up the aisle toward the employee with the phone. As he did so, he passed two stack bases[1] positioned in the center of the aisle. Plaintiff Woodard met the Wal-Mart employee with his phone near the third stack base in the aisle. The employee gave Plaintiff Woodard his phone as Woodard neared the far end of the third stack base.

What happened next is a matter of some dispute. According to Woodard, after receiving his phone, he turned to the right, intending to pass across the third stack base and return to the front of the store using the opposite side of the main aisle. As he took a step, he stubbed his right foot on a box weights that was on the floor against the stack base. As a result, he fell to the floor. According to Alan Bray, after Woodard got his phone from the employee, Woodard and Bray turned and began to walk back down the aisle toward the front of the store. As they walked down the aisle, Woodard told Bray to move out of the way to allow an employee coming down the aisle behind them to pass through. As they stepped out of the aisle, Woodard fell. Bray did not actually see Woodard fall; instead, he heard a noise and saw Woodard on the floor. Bray then saw a box of weights on the floor against the stack base. The parties agree that there was a box of weights on the floor against the stack base and that the box was roughly six inches high, a foot and a half wide, and

---

[1]     A stack base is apparently the retail industry term for a rectangular merchandise display commonly found in the middle of the wide main aisles of a retail store such as a Wal-Mart store.

four to five feet long.

Given that Plaintiff Woodard was only in the store for a brief period of time before his fall, he has no personal knowledge on the circumstances leading up to his fall, other than his own actions. He concedes that he has no personal knowledge of how long the box was on the floor prior to his fall or of how the box arrived at its fateful destination. He also concedes that he has no personal knowledge of whether Wal-Mart knew that the box was on the floor before he tripped on it. That is to say, although he interacted with several Wal-Mart employees after his fall, none of them ever stated that they knew the box was there, or how it got there, or how long it had been there.

One of the Wal-Mart employees that Woodard interacted with that night was Kenyatta Salazar, the assistant manager on duty at the time. Salazar spoke with Woodard and Bray after Woodard's fall and then filled out an incident report, which she submitted to Claims Management, Inc. ("CMI"), Wal-Mart's claims handling agent.

Within the next day or two after the fall, Glendon Bedeau, the Asset Protection Coordinator for the store at that time, reviewed the security camera footage from the area of the fall. In his deposition Bedeau stated that the video showed two customers walking up the action alley, but that when they went between the stack bases, nothing else was visible. He stated that he could not see any fall because it was alleged to have happened between two stack bases. When asked if the tape showed the floor around the stack base, he stated that the top and the side of the stack base was visible, but that the area between the stack bases was not. He further stated that he did not see the box that Plaintiff Woodard tripped over on the tape. He saved the relevant portion of the tape to be sent to CMI. [See generally Doc. 37].

Two days after the incident, on November 7, 2007, Wanda Adams, an adjuster for CMI assigned to the incident, requested any video of the area of the fall. On April 28, 2008, before this

suit was filed, counsel for Plaintiff Woodard spoke to Adams regarding the tape. Adams advised counsel that she could not release the video, but that it would have to be produced through discovery during litigation. According to her declaration, Adams had not viewed the tape sent by Wal-Mart at that time. [See generally Doc. 56 Exh. B].

Some time after April 28, 2008, Adams viewed the tape in her possession. According to her declaration, she learned at that point that the tape in her possession was not the tape of the area of Plaintiff Woodard's fall. Instead, the tape was of an entirely different incident involving a customer named Donald Williams. Adams asked Wal-Mart to resend the video of Plaintiff Woodard's accident, but by that time the video hard drives had been changed. [See id.].

According to Adams's declaration, she does not know what happened to the video of the area at the time of Plaintiff Woodard's accident that Bedeau viewed and saved to be sent to CMI. She does not know whether it was ever sent by the store, whether it was shipped incorrectly, or whether it was mislabeled or misfiled at the store or at CMI. She states that she has never been in possession of any video of Plaintiff Woodard's accident, nor has she ever seen any video of Plaintiff Woodard's accident. She further states that she did not intentionally lose, destroy, or misplace the video. For his part, Bedeau also states that he does not know whether the tape was mailed incorrectly or mislabeled or misfiled at CMI or the store, but professes that he did not intentionally lose, destroy, or misplace the video.

On October 15, 2009, Plaintiff Woodard filed suit against Wal-Mart in the State Court of Bibb County, Georgia. Woodard alleged that his fall caused injuries to his cervical spine that resulted in physical pain and that caused him to incur medical expenses and lost wages. On December 17, 2009, Wal-Mart removed the action to this Court based on diversity of citizenship

jurisdiction.[2]

After the close of discovery, the parties filed a number of motions. Wal-Mart filed a Motion for Summary Judgment [Doc. 26], and two Motions in Limine regarding Woodard's expert testimony [Docs. 27 and 28]. In addition to responding to those motions, Plaintiff Woodard also filed a Motion for Sanctions seeking spoliation sanctions based on the loss of the videotape of his fall [Doc. 48]. After full briefing on the Motion for Sanctions, Wal-Mart requested leave to file a sur-reply brief regarding the issue [Doc. 58]. In this Order, the Court will address Wal-Mart's Motion for Summary Judgment [Doc. 26], Woodard's Motion for Sanctions [Doc. 48], and Wal-Mart's Motion for Leave to File a Sur-reply [Doc. 58].

## II. LEGAL STANDARD

Motions for summary judgment in federal courts are governed by the Federal Rules of Civil Procedure. Summary judgment must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir.1996). Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505 (1986). This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the

---

[2] At that time, Woodard had joined Damon Manning, a Georgia resident, as a defendant. Woodard sought to have the case remanded to state court based on a lack of complete diversity. In response, Wal-Mart argued that Woodard had fraudulently joined Manning to defeat diversity jurisdiction. The Court found that Woodard had fraudulently joined Manning. Accordingly, the Court dismissed Manning as a defendant and denied Woodard's Motion to Remand. [Doc. 12].

verdict.  See id. at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence.  See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097 (2000).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.  Celotex, 477 U.S. at 323 (internal quotation marks omitted).

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions.  See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir.1991).  Ultimately, summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof."  Celotex, 477 U.S. at 323.

### III. DISCUSSION

Under Georgia law, owners and occupiers of land must exercise ordinary care in keeping their premises safe for invitees.  O.C.G.A. § 51-3-1.  In order to prevail in a premises liability case, a plaintiff must demonstrate "(1) that the defendant had actual or constructive knowledge of the foreign substance and (2) that the plaintiff was without knowledge of the substance or for

some reason attributable to the defendant was prevented from discovering the foreign substance." Alterman Foods, Inc. v. Ligon, 246 Ga. 620, 623 (1980); see also Robinson v. Kroger Co., 268 Ga. 735, 736 (1997).

In American Multi-Cinema Inc. v. Brown, 285 Ga. 442 (2009), the Georgia Supreme Court expanded on the burden of production scheme that courts must apply at the summary judgment phase in premises liability cases. In order to successfully oppose a motion for summary judgment, "a plaintiff must come forward with evidence that, viewed in the most favorable light, would enable a rational trier of fact to find that the defendant had actual or constructive knowledge of the hazard." Id. at 444-45. If the plaintiff produces such evidence, "the burden of production shifts to the defendant to produce evidence that the plaintiff's injury was caused by his or her own voluntary negligence (intentional disregard of a known risk) or causal negligence (failure to exercise ordinary care for one's personal safety)." Id. at 445. Once the defendant discharges that burden, "the burden of production shifts back to the plaintiff to come forward with evidence that creates a genuine dispute of fact on the question of voluntary or causal negligence by the plaintiff or tends to show that any such negligence resulted from the defendant's own actions or conditions under the defendant's control." Id.

The Georgia Supreme Court has also cautioned that "the 'routine' issues of premises liability, i.e., the negligence of the defendant and the plaintiff, and the plaintiff's lack of ordinary care for personal safety are generally not susceptible of summary judgment, and that summary judgment is granted only when the evidence is plain, palpable, and undisputed." Robinson, 268 Ga. at 748.

    A.    Wal-Mart's Actual or Constructive Knowledge of the Hazard

In order to defeat a motion for summary judgment, the plaintiff must produce evidence

8

demonstrating that the defendant had actual or constructive knowledge of the hazard. Kroger, 268 Ga. at 737. "Constructive knowledge may be proved in two ways: by showing that an employee of the defendant was present in the immediate area and could easily have seen the substance and removed it; or by showing that the substance was on the floor for such a time that it would have been discovered and removed had the proprietor exercised reasonable care in inspecting the premises." Roberson v. Winn-Dixie Atlanta, Inc., 247 Ga. App. 825, 825-26 (2001).

Woodard contends that he can establish a question of fact as to Wal-Mart's actual or constructive knowledge of the hazard through three avenues: (1) the presence of Wal-Mart employees in the area prior to his fall, (2) the nature of the hazard itself, and (3) Wal-Mart's loss of the videotape of the area at the time of his fall.[3] As set forth below, the loss of the videotape is sufficient to create an issue of material fact as to whether Wal-Mart had actual or constructive knowledge of the hazard. Because the loss of the videotape alone is sufficient to defeat the motion for summary judgment, the Court will not address Woodard's two other contentions.

Woodard contends that Wal-Mart should be sanctioned for the loss, or as he terms it, destruction, of the videotape of the area at the time of his fall. He contends that the loss of the tape has prejudiced his case because it would be significant and important evidence of Wal-Mart's knowledge of the hazard. He also contends that Wal-Mart acted in bad faith in losing the videotape. Woodard requests that the Court enter an order preventing Wal-Mart from asserting

---

[3]      Woodard pursued his arguments regarding spoliation of the videotape both in his Response to Wal-Mart's summary judgment motion and in the separate Motion for Sanctions. This portion of the Order will be predominantly aimed at Woodard's Motion for Sanctions. At the conclusion of this section, the Court will explain how its disposition of the Motion for Sanctions affects the summary judgment inquiry.

defenses regarding lack of knowledge, reasonable inspection procedures, or Woodard's failure to exercise ordinary care. In the alternative, Woodard requests an adverse inference against Wal-Mart based on the loss of the videotape.

A court's power to impose sanctions for spoliation flows from its inherent power to manage its affairs and achieve an orderly and expeditious disposition of cases. <u>Flury v. Daimler Chrysler Corp.</u>, 427 F.3d 939, 944 (11th Cir. 2005). Sanctions function to prevent unfair prejudice to litigants and to ensure the integrity of the discovery process. <u>Id.</u>

In diversity suits, federal laws govern the imposition of spoliation sanctions. <u>Id.</u> The Eleventh Circuit has not set forth specific guidelines governing spoliation sanctions. In <u>Flury</u>, also a diversity case based on Georgia law, the Eleventh Circuit noted that Georgia law on spoliation was "wholly consistent with federal spoliation principles." <u>Id.</u> Accordingly, the court's analysis in that case was informed by the factors relevant to spoliation sanctions under Georgia law. <u>Id.</u> Those factors are: "(1) whether the [opposing party] was prejudiced as a result of the destruction of the evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the [party] acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence was not excluded."[4] <u>Bridgestone/Firestone N. Am. Tire, LLC v. Campbell</u>, 574 S.E.2d 923, 926 (Ga. Ct. App. 2002). "As sanctions for spoliation, courts may impose the following: (1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator." <u>Flury</u>, 427 F.3d at 945.

---

[4] The fifth factor is more suited to a products liability case, where one side might seek to introduce expert testimony about an allegedly defective product that was lost or destroyed before the other side could inspect it. In a premises liability case, such as this one, the factor is largely irrelevant.

The Eleventh Circuit described Georgia spoliation law as "wholly consistent" with federal spoliation principles in Flury. That statement, however, is in tension with other Eleventh Circuit spoliation cases. Although the Eleventh Circuit has not enumerated precise spoliation guidelines, it has previously expressed the need for a finding of bad faith before imposing spoliation sanctions. Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997) ("In this circuit, an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith."); see also United States of America v. Lanzon, No. 09-14535, slip op. at 19 (11th Cir. May 4, 2011) (assuming that spoliation applies in a criminal case and stating that "[a]n 'adverse inference instruction' is proper in civil cases where a party has failed to preserve evidence and there is a showing of bad faith in doing so" (citing Bashir)). In Bashir, the court stated that "[m]ere negligence in losing or destroying the records is not enough for an adverse inference, as it does not sustain an inference of consciousness of a weak case." 119 F.3d at 931 (internal quotation marks omitted).

On the other hand, the Georgia principles that the court approved in Flury appear to treat bad faith as only one factor, and not a requirement for imposing spoliation sanctions. See Bridgestone, 574 S.E.2d at 927 (noting that "malice may not always be required before a trial court determines" that sanctions are appropriate and directing trial courts to "weigh the degree of the spoliator's culpability against the prejudice to the opposing party"). To be sure, Flury held that *dismissal* was only appropriate "where there is a showing of bad faith and where lesser sanctions will not suffice." 427 F.3d at 944. Moreover, the court necessarily found that bad faith existed in that case because it held that dismissal of the plaintiff's case was the appropriate sanction. Id. at 944-45. Nevertheless, the court's statement in Flury that Georgia law was "wholly consistent" with federal spoliation principles might be read to imply that bad faith is

11

only a factor and not a requirement when imposing spoliation sanctions – or at least sanctions less harsh than dismissal. At least one district court has read the Eleventh Circuit's statement in Flury to downgrade bad faith from a requirement to a factor to be considered. See Brown v. Chertoff, 563 F. Supp. 2d 1372, 1381 (S.D. Ga. 2008).

Seizing on Flury, Plaintiff urges that a finding of bad faith is not a prerequisite for imposing spoliation sanctions, but instead only a factor to be considered. The Court disagrees with that proposition and declines to read Flury as having removed the bad faith requirement. Under Bashir, an adverse inference can only be drawn "when the absence of . . . evidence is predicated on bad faith." 119 F.3d at 931. To the extent that Flury creates a conflicting line of authority where bad faith is only a factor to be considered, the Court must follow the law set down in Bashir because it is the earlier authority. See Walker v. Mortham, 158 F.3d 1177, 1188 (holding that when lines of circuit authority conflict, courts should look to the line containing the earliest case).[5] This rule is a natural extension of the prior panel rule, under which panels are "bound by the holdings of earlier panels unless and until they are clearly overruled en banc or by the Supreme Court." Gandara v. Bennett, 528 F.3d 823, 829 (11th Cir. 2008). Federal law governs the imposition of spoliation sanctions in federal court. Flury, 427 F.3d at 944. The Eleventh Circuit expressed the relevant statement of federal law in Bashir, and this Court will continue to follow it.

Having resolved that matter, the Court now turns to the question of whether sanctions are appropriate in this case. As in Flury, the Georgia law factors found in Bridgestone will inform the analysis, but consistent with Bashir, bad faith will be a requirement and not simply a factor.

_____

[5] The rule in Bashir was in fact taken from Vick v. Texas Employment Comm'n, 514 F.2d 734 (5th Cir. 1975), so the bad faith requirement even predates Bashir itself.

The first three <u>Bridgestone</u> factors support the imposition of sanctions in this case. The loss of the videotape will likely prejudice Plaintiff Woodard in proving his case. One of the key hurdles that Plaintiff faces is proving that Wal-Mart had superior knowledge of the hazard. Such knowledge might be actual or constructive. <u>Alterman Foods, Inc. v. Ligon</u>, 272 S.E.2d 327, 330 (Ga. 1980). Constructive knowledge can be shown through proof that the hazard was on the floor a sufficient length of time for knowledge of it to be imputed to the defendant. <u>Id.</u> The video would certainly be relevant to whether Wal-Mart had actual or constructive knowledge of the hazard. Video of the area in the time leading up to Plaintiff's fall could have shown who placed the box of weights against the stack base and when. <u>See</u> <u>Baxley v. Hakiel Indus., Inc.</u>, 647 S.E.2d 29, 30 (Ga. 2007) (holding spoliation sanction should have been applied when a destroyed videotape could have contained evidence relevant to critical issue of plaintiff's case). On the other hand, if the video did not show the box of weights being placed against the stack base, then it would support the inference that the weights had been present for at least the length of the recording.[6]

The prejudice to Woodard's case can be addressed to some degree by the testimony of Bedeau and Wal-Mart employee Christopher Walton. As already described, Bedeau viewed the missing tape. In his deposition and again through a declaration, Bedeau stated that he did not see the actual fall on the video, that he could not see the box on the video, and that the video did not show the floor where the fall occurred. Walton stated in his deposition, and later clarified in a declaration, that he walked by the area of the fall fifteen to twenty minutes prior to the fall, that

---

[6]     In his Rule 30(b)(6) deposition for Wal-Mart, Store Manager Manning stated that he believed when reviewing video of an incident the video should be reviewed up to an hour before the incident. [<u>See</u> Doc. 39 at 25-26].

there was no box of weights on the floor at that time, and that he would have removed any box of weights on the floor had there been one. [Doc. 26-3; Doc. 36]. Wal-Mart contends that this testimony serves as such a strong cure for the missing tape that there is no prejudice to Plaintiff.

The Court disagrees. Certainly Bedeau's and Walton's testimony will be relevant, but it hardly works a complete cure to the loss of the videotape. Walton's statement only goes to the condition of the area in a brief moment prior to the fall as he walked through the area. The only two things that Bedeau states with certainty during his deposition is that the video did not show the actual fall and that the box of weights could not be seen between the two stack bases on the video. Of course, the video might have showed any other number of things relevant to a premises liability case that Bedeau might not have taken note of at the time. In the absence of the video itself, Plaintiff is left to draw out anything else the video might have showed through the testimony of an individual who may not have known the significance of what he was viewing, and who is being asked to recall the contents of that video three to four years after the fact. Plaintiff will be able to test the credibility of Bedeau and Walton and the accuracy and consistency of their testimony to some degree through cross examination, but the task is rendered much more difficult without the video. Their testimony may alleviate some of the prejudice to Plaintiff, but certainly not all of it.

The first two factors in turn speak to the practical significance of the videotape. The videotape is the most likely source of information as to how the box of weights found its way to the floor between the stack bases and how long it had been residing there when Plaintiff Woodard tripped on it. Whether what it showed would be helpful to Plaintiff is not certain, but it would certainly speak to those issues. Without it, Plaintiff is left to plumb the depths of the recollections of two Wal-Mart employees in an attempt to establish either of those facts. The

videotape is definitely significant.

The question of whether Wal-Mart acted in bad faith in losing or destroying the video is not so clear. Wal-Mart's explanation for the disappearance of the tape is one of inadvertence or honest mistake. Bedeau and Wanda Adams both speculate that the tape was mailed incorrectly or mislabeled or misfiled at the store or at CMI. Bedeau states that he saved the relevant portions of the tape to be sent to CMI. Adams is certain that the tape was never in her possession. Both are clear in their contentions that they did not intentionally lose, destroy, or misplace the video. Nonetheless, the videotape is nowhere to be found.

In short, although Bedeau and Adams speculate as to what may have happened to the videotape, the disappearance of the videotape is unexplained. The question then is whether the circumstances of the disappearance of the videotape are sufficient to support an inference of bad faith. The Eleventh Circuit spoke to this question in <u>Bashir</u>, which was a wrongful death case based on a train collision. There, the plaintiff sought an adverse inference based on the loss of a speed recorder tape which continuously documented the train's speed. Two witnesses stated via deposition and an affidavit that the train was traveling ten miles an hour under the speed limit at the time of the collision. 119 F.3d at 931-32. Their testimony in that regard matched statements they had given to the train's conductor and a police officer subsequent to the accident. <u>Id.</u> at 932. At the time they gave statements to the conductor and the police officer both witnesses knew that the train's speed was being documented by the speed recorder. <u>Id.</u> Neither witness had any control over the speed recorder tape or had any contact with anyone who had control over the speed recorder tape. <u>Id.</u> Against this evidence, the plaintiff produced no direct evidence of bad faith or tampering. <u>Id.</u> In light of those circumstances, the Eleventh Circuit found that it "need not decide whether a wholly unexplained loss of evidence might in other

15

circumstances warrant an inference of bad faith and thus an adverse inference," because an adverse inference was not warranted under those particular facts. Id. In doing so, the court distinguished the case of Stanton v. National Railroad Passenger Corp., 849 F. Supp. 1524 (M.D. Ala. 1994). In that case, only one witness testified, his testimony was that the train was traveling one mile an hour under the speed limit at the time. Id. at 932-33. The court described Stanton as presenting a situation where it was unclear that the defendant railroad in that case had "such strong evidence" in its favor as did the defendant in Bashir. Id. at 933.

The evidence in Wal-Mart's favor is not so strong as it was for the defendant in Bashir. Here, as in Stanton, Wal-Mart has the testimony of only one witness as to the contents of the videotape, Glendon Bedeau. Christopher Walton's testimony is not particularly corroborative of Bedeau's testimony. Walton states that he did not see the box of weights between the stack bases fifteen to twenty minutes before the fall, but Bedeau's testimony is simply that he could not see the box of weights at all – even when it admittedly was there at the time of the fall – because of the stack base. Moreover, Bedeau's statements as to the contents of the tape were given at a time after the tape was already lost, unlike the witnesses in Bashir who gave statements as to the contents of the missing tape at a time when they believed it was still in existence. Furthermore, unlike the witnesses in Bashir, Bedeau had the opportunity to tamper with or lose the videotape. It is unclear whether it was his job to actually mail the videotape, and if so, whether he actually mailed the tape or delegated that responsibility to someone else. Nevertheless, it is undisputed that Bedeau was responsible for reviewing the tape and saving the relevant portions to send to CMI, and that in that capacity he had physical control of the tape for a time. There is no evidence that Bedeau had a strong personal motive for losing the videotape, i.e., that he faced any personal repercussions if the tape showed evidence of Wal-Mart's liability

for the fall. On the other hand, Wal-Mart, his employer, faced liability if the videotape showed evidence demonstrating Wal-Mart's superior knowledge of the hazard.

On balance, the circumstances of the disappearance of the videotape are sufficient to support an inference of bad faith and to justify putting the issue to the jury. By its own admission, Wal-Mart's policies comprehend the need to evaluate and retain any videotape evidence of a trip-and-fall incident and then forward it to CMI. In that process, the videotape disappeared, and Wal-Mart has offered only speculation as to how that occurred. Wal-Mart can offer the testimony of only one person, Bedeau, as to the contents of that tape. Bedeau, however, is also the primary person with the opportunity to alter or lose the tape, and his statements as to its contents were given at a time when the tape was already lost.

Given that a question of fact remains as to whether Wal-Mart lost or destroyed the videotape in bad faith, the appropriate sanction in this case is a jury instruction on spoliation. If this case proceeds to trial, the jury will be instructed that if it finds that Wal-Mart lost or destroyed the videotape in bad faith, then the loss of the videotape gives rise to a rebuttable presumption that it contained evidence harmful to Wal-Mart on the issue of whether Wal-Mart had actual or constructive knowledge of the hazard. The parties should provide suggested instructions to that effect when the time comes.[7]

---

[7] Woodard also claims that Wal-Mart spoliated evidence when it did not preserve the box of weight he tripped over. No sanctions are necessary for Wal-Mart's failure to retain the box. There is no allegation that the box was defective or special in any way. There are pictures of the box next to the stack base. Multiple witnesses, including Wal-Mart employees, Woodard, and Alan Bray can testify as to the size and heft of the box. Their deposition testimony is in general agreement in that regard. If either party believes the physical presence of a box is necessary at trial, the parties can produce a mutually agreeable exemplar to be used. Given the ample evidence concerning the size and heft of the box and the fact that there is nothing inherently special about that particular box for purposes of this case, Wal-Mart's failure to retain the box does not raise any inference of bad faith, nor does its absence cause any

The Court now turns briefly to Wal-Mart's Motion for Leave to File a Sur-reply Brief on this matter. Wal-Mart requests leave to file a sur-reply in order to address what it characterizes as Plaintiff's contention, made in support of his motion for sanctions, that Wanda Adams indicated in a conversation with Plaintiff's counsel that she had the videotape in question as of the time of their conversation on April 28, 2008. Wal-Mart also seeks to depose Plaintiff's counsel in relation to this matter.

The Court has not relied on Plaintiff's vague contention that Wanda Adams had the videotape of Plaintiff's fall in her possession of April 28, 2008, but then lost or destroyed it so that it could not be turned over in discovery. Plaintiff's motion for sanctions is due to be granted, at least to the extent set forth above, even in that absence of that argument. Moreover, Plaintiff's argument on this score is not well founded. Plaintiff appears to believe that underlining the word "the" in the sentence stating that Adams told Plaintiff's counsel that she had "the videotape" somehow renders that statement contradictory to Adams's declaration that she has never seen, nor does she currently have in her possession, the videotape of Plaintiff's fall. That is simply not true. Adams readily admits that she had *a* videotape in her possession on April 28, 2008, that was associated with Plaintiff's file. Thus, it would have been entirely reasonable for her to state that she had the videotape. Plaintiff does not contend that she stated that she had watched the videotape at that point. Until she watched it, she had no reason to believe that it was anything other than the videotape associated with Plaintiff's fall. Thus, her statement to Plaintiff's counsel that she had the videotape as of April 28, 2008, is not contradictory to the statement in her declaration that when she viewed the videotape for the first

---

particular prejudice to Woodard.

time at some point after that conversation, she realized it was not the tape of Plaintiff's fall.

The Court does not require a sur-reply brief on that point of contention. It is quite capable of dismissing Plaintiff's extremely tenuous argument on its own. Furthermore, deposing Plaintiff's counsel on this matter will only needlessly increase the time and money spent on this case and greatly confuse the progress of this case going forward. The deposition is not necessary.

In sum, Plaintiff's Motion for Sanctions [Doc. 48] is **GRANTED-in-PART** and **DENIED-in-PART**. If this case proceeds to trial, the jury will be instructed to consider whether Wal-Mart destroyed or lost the videotape in bad faith. It will further be instructed that if it finds bad faith, then there is a rebuttable presumption that the videotape contained evidence harmful to Wal-Mart on the issue of whether it had actual or constructive knowledge of the hazard. No sanctions are warranted, however, for Wal-Mart's failure to retain the box of weights Plaintiff tripped over. Finally, Defendant's Motion for Leave to File a Sur-reply Brief [Doc. 58] is **DENIED**.

As promised, the Court now turns to the effect of its disposition of the Motion for Sanctions on Wal-Mart's Motion for Summary Judgment. As should be clear from the preceding discussion, whether Wal-Mart lost or destroyed the videotape in bad faith is an issue of fact for the jury, and resolution of the question in Woodard's favor would result in a rebuttable presumption that the videotape contained evidence harmful to Wal-Mart on the issue of whether it had actual or constructive knowledge of the hazard. In short, there is an issue of fact as to whether Wal-Mart had actual or constructive knowledge of the hazard.

Wal-Mart invokes what it terms the "Fifteen Minute Rule" in one final argument to attempt to establish as a matter of law that it did not have actual or constructive knowledge of

the risk. In <u>Mazur v. Food Giant, Inc.</u>, 183 Ga. App. 453, 454 (1987), the Georgia Court of

Appeals stated that if "it appears a foreign object had not been present for more than 10 to 15

minutes, the allegations show no actionable negligence on the part of the proprietor in failing to

discover it." The court upheld summary judgment in favor of the defendant in that case, at least

on the theory of constructive knowledge of the hazard, when the undisputed evidence showed

that the store manager and another employee walked by the location of the fall ten to fifteen

minutes prior to the accident and saw no foreign objects on the floor. <u>Id.</u> at 453-54. The court

applied the rule again in <u>Mallory v. Piggly Wiggly Southern, Inc.</u>, 200 Ga. App. 428, 430 (1991),

where the undisputed evidence showed that an employee swept the floor in the area of the

accident five minutes before the fall and saw no foreign objects on the floor. Other cases are to

the same effect. <u>See</u> <u>Smith v. Winn-Dixie Atlanta, Inc.</u>, 203 Ga. App. 565 (1992) (summary

judgment granted in favor of defendant when assistant manager had visually inspected location

of accident ten to fifteen minutes prior to fall and found no foreign substance); <u>Roberson v.

Winn-Dixie Atlanta, Inc.</u>, 247 Ga. App. 825, 826 (2001) (summary judgment granted in favor of

defendant when employee inspected the floor fifteen minutes before the accident and saw no

foreign substance).

Wal-Mart contends that the same result should follow in this case because one of its

associates, Christopher Walton, inspected the area of Woodard's fall fifteen to twenty minutes

prior to the accident and did not see the box of weights. Walton's deposition testimony on this

point was not a model of clarity. He stated that he participated in a safety sweep, in which

associates visually inspect the floor, when his shift began at 10:00 p.m. [Doc. 36 at 19-20].

Based on that, it is at least undisputed that Walton participated in a safety sweep roughly an hour

before Woodard's fall. From Walton's statement, it is not clear whether his safety sweep

20

included the location of the fall.  Walton then stated that he walked up the aisle on which

Woodard fell roughly fifteen to twenty minutes prior to the accident and that he did not see

anything on the floor at that time. [Id.].  It appears from his statement that he was not conducting

a safety sweep at that time, but was instead going to the back of the store to pick up

merchandise.  Nevertheless, he concluded "nothing was down there because when I walked,

nothing was there.  Like I don't know." [Id. at 20].  In a later declaration, Walton clarified that

he walked down the aisle past the exact location of the accident roughly fifteen to twenty

minutes before Woodard fell and that he visually inspected the area at that time and did not see

the box of weights. [Doc. 26-3].

Given the particular facts of this case, the evidence concerning Walton's inspection of

the area is not so "plain, palpable, and undisputed" as to establish as a matter of law that Wal-

Mart did not have actual or constructive knowledge of the hazard.  "The length of time that a

foreign substance must remain on the floor before a proprietor should have discovered it – and,

by extension, what constitutes a reasonable frequency of inspections – will vary with the

circumstances of each case (the nature of the business, size of the store, the number of

customers, the nature of the dangerous condition and the store's location)." J.H. Harvey Co.

Reddick, 240 Ga. App. 466, 471 (1999) (internal quotation marks omitted).  Viewing the timing

of Walton's inspection in the light most favorable to Woodard, Walton inspected the area twenty

minutes prior to the fall.  The cases cited by Wal-Mart, however, all state that inspections within

ten to fifteen minutes of an accident can establish reasonable care on the part of the store owner.

Walton's inspection falls outside of that window.  Indeed, the Georgia Court of Appeals has held

that the reasonableness of an inspection on the order of twenty to thirty minutes before an

accident can constitute a question for the jury.  See Shepard v. Winn Dixie Stores, Inc., 241 Ga.

App. 746, 748 (1999) (reasonableness of inspection conducted every thirty minutes a jury question); Jones v. Krystal Co., 231 Ga. App. 102, 104-05 (1998) (no evidence of inspection within twenty minutes of accident creates a jury question on constructive knowledge).  In both of those cases, the court focused on the particular circumstances of the accident and the nature of the hazard in concluding that the reasonableness of the frequency of the inspection was a question for the jury.  Turning to the circumstances of this case, Woodard's fall happened during the nighttime hours when associates, such as Walton, were restocking the store.  Woodard fell over a large piece of merchandise left in the floor.  Under those circumstances, it is for the jury to determine whether inspecting the floor for fallen or misplaced merchandise roughly every twenty minutes during the time when employees are moving merchandise throughout the store was reasonable.

The Court's conclusion in that regard is further buttressed by its disposition of the question of the missing videotape.  First, any inferences the jury might draw from the absence of the tape could also affect its assessment of the reasonableness of Walton's inspection. For instance, although Bedeau stated that he could not see between the stack bases – presumably because both the stack bases and the camera's view were aligned down the long axis of the main aisle –, he could apparently see the aisle on either side of the stack bases because he saw Woodard and Bray walking up and down the aisle before and after the fall.  If Walton's testimony is accurate and the box was not there at that time, then the twenty minutes of the tape prior to the fall should have shown someone traveling up or down the aisle with the box of weights and leaving it there.  If the tape did not show that, then that would support the inferences that Walton did not actually inspect the area as he walked through and that the box had been there for more than fifteen or twenty minutes.  If the jury finds that Wal-Mart spoliated the tape

in bad faith, the predicate inference that the tape did not show anyone placing the weights there after Walton's alleged inspection is one the jury could reasonably draw from the rebuttable presumption that the tape contained evidence harmful to Wal-Mart. Furthermore, laying aside the question of constructive knowledge, the jury might draw an inference of actual knowledge on Wal-Mart's part if they conclude Wal-Mart spoliated the tape in bad faith. If the case is to survive summary judgment on that basis, it would be premature to take the question of constructive knowledge out of the jury's hands given that Wal-Mart's evidence to support a lack of constructive knowledge is not "plain, palpable, and undisputed."

In light of the foregoing, the Court cannot grant summary judgment in favor of Wal-Mart on the issue of whether it had actual or constructive knowledge of the hazard.

B.     Woodard's Knowledge of the Hazard

As to the second prong of the liability analysis, Wal-Mart eschews the burden shifting framework of Robinson and Brown and jumps right to the final step by arguing that Woodard failed to exercise ordinary care as a matter of law.  Brown, 285 Ga. at 445 (final burden is on plaintiff to produce evidence "that creates a genuine dispute of fact on the question of voluntary or causal negligence by the plaintiff or tends to show that any such negligence resulted from the defendant's own actions or conditions under the defendant's control").  Wal-Mart presents several facts in support of its contention that Woodard failed to exercise ordinary care.  None of them are sufficient to prove the point as a matter of law; instead, they demonstrate that the evidence is not "plain, palpable, and undisputed" and that, as a result, summary judgment is inappropriate.  Robinson, 268 Ga. at 748.

Wal-Mart begins by pointing out that Woodard did not see the box of weights on the floor prior to tripping over it.  Standing alone, Woodard's failure to see the box before he tripped

over it cannot establish a lack of care on his part.  See Robinson, 268 Ga. at 743 ("disapprov[ing] of the appellate decisions which hold as a matter of law that an invitee's failure to see before falling the hazard which caused the invitee to fall constitutes a failure to exercise ordinary care").  That Woodard admittedly did not see the box before tripping on it actually establishes that his fall was not the result of his own voluntary negligence.  As to the issue of Woodard's casual negligence, asserting that Woodard was negligent because he did not see the box only begs the question at issue here: whether Woodard should have seen the box had he been exercising reasonable care.  See id. at 741 ("An invitee is charged with exercising ordinary care for personal safety and using ordinary care to avoid the effect of the owner/occupier's negligence after that negligence becomes apparent to the invitee or in the exercise of ordinary care the invitee should have learned of it.").

Wal-Mart then argues that several facts demonstrate that it did not prevent Woodard from seeing the box prior to his fall.  Wal-Mart asserts: (1) that Woodard was not in a hurry at the time of his fall, (2) that Woodard was not distracted prior to or at the time of the fall, (3) that the area of the fall was well lit, (4) that there were no obstruction to Woodard's view of the box prior to the fall, (5) and that Woodard did not look at the ground as he was approaching the area or making his turn prior to the fall.  None of these facts establish as a matter of law that Woodard was not exercising reasonable care.

The first fact cuts against Wal-Mart.  That Woodard was not in a hurry cannot establish negligence on Woodard's part; indeed, that he was not hurrying would support the inference that he was exercising reasonable care in walking through the store.

Neither a lack of distraction on Woodard's part or the adequate lighting in the area of the fall show anything about whether Woodard was exercising reasonable care.  To the extent they

are undisputed, these facts would tend to show that any negligence on Woodard's part in tripping over the box was not a result of Wal-Mart's "actions or conditions under [its] control."[8] Brown, 285 Ga. at 445. These facts, however, say nothing in the first instance about whether Woodard was exercising ordinary care.

Although Wal-Mart's final two facts are relevant to the question of whether Woodard was exercising ordinary care, neither is sufficient to establish as a matter of law that Woodard was not exercising ordinary care. While Wal-Mart asserts that there were no obstructions for Woodard prior to or at the time of the fall, the evidence indicates otherwise. It is undisputed that the box of weights was located on the floor against the far side of the stack base, relative to the direction from which Woodard was approaching. Woodard testified in his deposition that the stack base was too high for him to see over. Wal-Mart has produced no evidence to the contrary. Wal-Mart also failed to produce any evidence showing that the box protruded into the aisle such that it was visible from the direction Woodard was approaching. On the contrary, in her deposition Kenyatta Salazaar testified that the box did not stick out into the aisle. [Doc. 38 at 79-

_____

[8]     Beyond that, there may be a disputed issue of fact as to whether Woodard was distracted at the time of the fall. Woodard testified in his deposition that he had completed his conversation with the employee who had his phone before he turned and subsequently fell. Under Alan Bray's account, however, the fall happened when he and Woodard moved aside to let a Wal-Mart employee transporting merchandise from the back of the store pass them in the aisle. [Doc. 31 at 55-57]. Although it may be unusual that the most favorable evidence for Woodard's case, at least on this point, does not come from Woodard's account of the fall, on deciding a motion for summary judgment, "the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 254-55.
        In any event, the Court need not decide whether Bray's testimony is factually or legally sufficient to create a jury question as to whether Woodard's failure to see the box prior to falling was a result of Wal-Mart's actions. As set forth in the remainder of this section, there is ample evidence to create a genuine issue of fact as to whether Woodard was exercising reasonable care, and that issue of fact is sufficient to defeat the motion for summary judgment.

80].  Given the size of the box of weights and its positioning against the stack base, it is reasonable to infer that the box would have been visible to someone near the stack base looking perpendicular to the aisle.  Wal-Mart, however, has not produced any evidence indicating that the box would have been visible to someone following Woodard's path unless and until he turned to cross perpendicular to the long axis of the aisle after passing the stack base.  In that regard, Wal-Mart contends that Woodard's failure to look at the ground as he was making his turn constitutes a lack of reasonable care on his part.  In Robinson, however, the Georgia Supreme Court held that a plaintiff's "failure to exercise ordinary care is not established as a matter of law by the [plaintiff's] admission that he did not look at the site on which he placed his foot or that he could have seen the hazard had he visually examined the floor before taking the step which led to his downfall."  268 Ga. at 748.  Given Woodard's path of approach and the configuration of the stack base and the box of weights, the evidence does not "plain[ly]" and "palpabl[y]" demonstrate that Woodard was not exercising ordinary care.  Robinson, 268 Ga. at 748.  As is generally true in premises liability cases, the question of whether Woodard was exercising reasonable care is one for the jury.  See id.

Because a genuine issue of fact remains as to both whether Wal-Mart had actual or constructive knowledge of the hazard and whether Woodard exercised reasonable care, Wal-Mart's motion for summary judgment must be denied.

### III. CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Sanctions [Doc. 48] is **GRANTED-in-PART** and **DENIED-in-PART**.  If this case proceeds to trial, the jury will be instructed to consider whether Wal-Mart destroyed or lost the videotape in bad faith.  It will further be instructed that if it finds bad faith, then there is a rebuttable presumption that the

videotape contained evidence harmful to Wal-Mart on the issue of whether it had superior knowledge of the hazard. No sanctions are warranted, however, for Wal-Mart's failure to retain the box of weights Plaintiff tripped over. Defendant's Motion for Leave to File a Sur-reply Brief [Doc. 58] is **DENIED**.

Finally, there are issues of material facts as to whether Wal-Mart had actual or constructive knowledge of the hazard and whether Woodard exercised ordinary care or whether any negligence on his part was the result of actions or conditions within Wal-Mart's control. Thus, Wal-Mart's Motion for Summary Judgment [Doc. 26] is **DENIED**.

SO ORDERED this 13th day of July, 2011.

S/ C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

bcw