# IN THE UNITED STATES DISTRICT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | | |
|---|---|---|
| **JIMMY WOODARD** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| | : | |
| **v.** | : | **5:09-cv-428 (CAR)** |
| | : | |
| **Wal-Mart Stores East LP,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## ORDER ON DEFENDANT=S MOTIONS TO EXCLUDE

Plaintiff Jimmy Woodard contends that while shopping at Wal-Mart, he fell and injured himself.  Defendant Wal-Mart has filed *Daubert* motions to exclude the medical causation opinions of Woodard=s treating physician, Dr. Mellayne Myers [Doc. 27], and his treating surgeon, Dr. George Stefanis [Doc. 28], and Woodard has responded to the motions. [Doc. 42].  The parties did not request a hearing.  After reviewing the briefs of the parties, the depositions of the two expert witnesses, and the law, the Court **DENIES** Defendant=s *Daubert* motions.

## BACKGROUND

Woodard filed a complaint against Wal-Mart alleging that he tripped and fell at the Wal-Mart store in Macon, Georgia, on or about November 5, 2007.  He further alleged that

he injured his neck and shoulder when he fell.  Important to Wal-Mart=s arguments is that Woodard had had pre-existing degeneration in his cervical spine.  Also, he hurt his shoulder at work and had surgery on that shoulder one month before the fall.

Woodard tore his right rotator cuff and his biceps tendon at work. These were his occupational injuries.  He suffered these injuries when he tried to lift something at work that weighed 200 pounds.  Dr. Steve Barnes at Piedmont Orthopaedic Clinic operated on Woodard=s right shoulder on October 4, 2007.

After the fall, Dr. Myers treated Woodard for neck problems, and then referred him to Dr. Stefanis, a neurosurgeon, who operated on his neck.  Woodard intends to offer both doctors= opinions that the fall caused or contributed to his neck injuries and problems with pain and numbness in his arm and hand.

### Walmart=s *Daubert* Arguments

Regarding Dr. Myers=s opinions, Wal-Mart argues that because Myers could not testify within a Areasonable degree of medical certainty@ that the fall caused Woodard=s shoulder and neck injuries, the Court should exclude his causation opinions.  Wal-Mart further contends that Myers=s opinions are speculative, represent Aa mere proximity argument,@ fail to Afit@ the case, and fail to satisfy the factors outlined in *Daubert* for testing expert opinions under Fed. R. Evid. 702.

Regarding Dr. Stefanis's opinions, Wal-Mart argues that Stefanis guessed and speculated about what caused Woodard's neck injuries.  Also, he lacked sufficient facts and data to form his opinions, he did not employ a reliable method, and his opinions do not assist the jury. Wal-Mart further contends that Stefanis failed to satisfy the factors for testing expert opinions in both *Daubert* and the Fed. R. Evid. 702 advisory committee notes.

### *Legal Standard*

Federal Rule of Evidence 702 governs the admissibility of expert testimony, and it states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Simply stated, under Rule 702, the trial court can admit relevant expert testimony only if it finds that: (1) the expert is qualified to testify about the matters he intends to address; (2) the methodology used by the expert to reach his conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue.  *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir.

2002) (citing *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001)); *J & V Dev., Inc. v. Athens-Clarke County*, 387 F. Supp. 2d 1214, 1223 (M.D. Ga. 2005).

As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, Rule 702 imposes a duty on trial courts to act as "gatekeepers" to insure that speculative and unreliable opinions do not reach the jury.  509 U.S. 579, 589 n. 7 (1993); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).  Acting as a gatekeeper, the trial court must make certain that expert witnesses employ in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003).  The court's gatekeeping role is especially significant, since "the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

To fulfill its role , the trial court must determine whether the expert has the requisite qualifications to offer his or her opinions.  *Poulis-Minott v. Smith*, 388 F.3d 354, 359 (1st Cir. 2004); *Frazier*, 387 F.3d at 1260-61.  The trial court must also "conduct an exacting analysis" of the *foundations* of expert opinions to ensure that they meet the standards for admissibility under Rule 702." *Frazier*, 387 F.3d at 1260 (quoting *McCorvey*, 298 F.3d at 1257) (emphasis in original).  Finally, the court must "ensure the relevancy of expert testimony," meaning that it must determine whether the testimony will assist the trier of fact.  *Daubert*, 509 U.S. at 591.

The court performs its gatekeeping role consistent with Rule 104(a), which commits preliminary evidentiary questions to the court=s decision and which further empowers courts in answering these questions to rely on evidence without being constrained by the rules of evidence.[1]  *Id.* at 593.  In sum, in acting as a gatekeeper, the court must keep Aunreliable and irrelevant information from the jury@because of its Ainability to assist in factual determinations, its potential to create confusion, and its lack of probative value.@ *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999).

Although *Daubert* involved scientific experts, the Supreme Court has made it clear that the strictures of Rule 702 and *Daubert* apply with equal force to non-scientific expert witnesses.  *See Kumho Tire*, 526 U.S. at 147.  Also, in all cases the proponent of the expert witness bears the burden of establishing that the expert=s testimony satisfies the qualification, reliability, and helpfulness requirements of Rule 702 and *Daubert*.  *McClain*, 401 F.3d at 1238 & n. 2; *Frazier*, 387 F.3d at 1260.  Finally, A[a]ny step that renders the analysis unreliable renders the expert=s testimony inadmissible.@*Goebel*, 346 F.3d at 992 (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 782 (10th Cir. 1999)) (internal alterations omitted).

---

[1]         In particular, Rule 104(a) provides that A[p]reliminary questions concerning the qualification of a person to be a witness . . . shall be determined by the court. . . . In making its determination, it is not bound by the rules of evidence except those with respect to privileges.@Fed. R. Evid. 104(a).

Beginning with the qualification requirement, the Eleventh Circuit has explained that "experts may be qualified in various ways." *Frazier*, 387 F.3d at 1260-61.  Certainly, an expert's scientific training or education may provide one means by which an expert may qualify to give certain testimony; however, experience in a particular field may also qualify an expert to offer an opinion on a particular matter.  *Id.*  Indeed, "experts come in various shapes and sizes," and, consequently, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field." *Santos v. Posadas de Puerto Rico Assocs.*, 452 F.3d 59, 63 (1st Cir. 2006).  In all cases, the court must focus its inquiry on whether the expert has the requisite skill, experience, training, and education to offer the testimony he intends to introduce.  *Poulis-Minott*, 388 F.3d at 359.

Regarding the reliability requirement, the Eleventh Circuit directs trial courts to assess "whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning or methodology properly can be applied to the facts at issue." *Frazier*, 387 F.3d at 1262.   This inquiry must focus "solely on the principles and methodology [of the experts], not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *Goebel*, 346 F.3d at 992.

*Daubert* offers four non-exclusive factors that courts may consider in evaluating the reliability of an expert's testimony: (1) testability; (2) error rate; (3) peer review and publication; and (4) general acceptance.  509 U.S. at 593-95; *J & V Dev., Inc.*, 387 F. Supp. 2d

at 1223.  These four factors most readily apply in cases involving scientific testimony and may offer little help in other cases, particularly those involving non-scientific experts.  *See Kumho Tire*, 526 U.S. at 150-52.  Accordingly, these factors merely illustrate rather than exhaust the factors or tests available to the trial court.  The trial court has "considerable leeway" in deciding which tests or factors to use to assess the reliability of an expert=s methodology.  *Id.*

The advisory committee=s notes for Rule 702 offer an additional list of factors or tests. These tests are:

(1)    Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;

(2)    Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(3)    Whether the expert has adequately accounted for obvious alternative explanations;

(4)    Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(5)    Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702, advisory committee=s note (2000 amendments).  Like the four *Daubert* factors, these factors do not comprise a definitive checklist, nor is any single factor dispositive of reliability; instead, the tests articulated in the advisory committee=s notes merely illustrate the issues a court may consider in evaluating an expert=s testimony.  *See id.*

Finally, for admission, the expert testimony must assist the trier of fact.  Expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262.  "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.*  Nor does expert testimony help the trier of fact if it fails to "fit" with the facts of the case.  *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004).  Expert testimony lacks "fit" when "a large analytical leap must be made between the facts and the opinion." *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* Thus, the court may exclude otherwise reliable testimony if it does not have "sufficient bearing on the issue at hand to warrant a determination that it [is >helpful=to the trier of fact]." *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1121 (10th Cir. 2004).

At all times when scrutinizing the reliability and relevance of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury=s role as the ultimate fact-finder.  A district court=s "gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury." *Allison*, 184 F.3d at 1311-12. "Vigorous cross- examination, presentation of contrary evidence, and careful instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  A court may not "evaluate the credibility of

opposing experts—or the "persuasiveness of competing scientific studies"; instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK, Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003); *Frazier*, 387 F.3d at 1272.

### Analysis of Dr. Myers's Opinions on Causation

Dr. Myers has practiced medicine at the Piedmont Orthopaedic Clinic in Macon for over ten years.  Until recently, he was board-certified in family practice.  Currently, he is board-certified in emergency medicine and board-eligible in occupational medicine.  He described himself as "a conservative medical practitioner for the practice of musculoskeletal conditions." (Myers depo. at 8).  He is well-qualified to offer the opinions he gives in this case.

The Court can easily resolve Wal-Mart's objection that according to Myers the fall aggravated Woodard's pre-existing shoulder injury.  Dr. Myers did not testify in his deposition that the fall aggravated Woodard's pre-existing shoulder problems.  Indeed, he said just the opposite.  When asked if he found any objective evidence that the fall caused more problems in Woodard's shoulder, he answered: "None related to his shoulder." (*Id.* at 62).  Earlier in the deposition he testified that he did not believe that the fall aggravated Woodard's right shoulder.  (*Id.* at 20).  Myers's opinions about the cause of Woodard's neck problems, however, require some analysis.

9

In treating Woodard, Myers kept two separate charts, a chart for his occupational medical problems and a chart for his non-occupational problems that arose from the fall. Myers used two charts to keep a proper record for payment of workers= compensation benefits versus personal insurance for the fall.

Myers testified that in treating Woodard for injuries from the fall, he carefully documented the details of Woodard=s history because of his interest in Woodard=s occupational condition. AAnd his occupational condition had become . . . complicated by a non-occupational event that had happened during his course of active treatment for this occupational condition.@ (*Id.* at 14).  Moreover, Myers was Avery careful to differentiate in the records post-fall that there was no aggravation, change for the worse, adverse change in his occupational condition from the fall at Wal-Mart.@ (*Id.* at 20).

In treating Woodard for injuries the fall allegedly caused, Myers ordered several tests, including an EMG/NCV study, and an MRI.  Among other findings, the EMG study showed a right C-6 radiculopathy with axonal degeneration.  The MRI showed a C5-6 mild to moderate right-sided disc protrusion and a minimal to mild bulging disc at C6-7.

At the April 16, 2008 visit, Myers told Woodard that Ahis symptoms in the right upper extremity were very likely related to his neck.@ (*Id.* at 27).  So Myers referred him to Dr. Stefanis, a surgeon.  At that point, Myers had treated Woodard=s neck problems conservatively for about five months with no success.

On the causation issue, Myers testified that "based on the information available to me at the time that the changes documented by the MRI and the EMG/NCV of the right arm could not be tied to his occupational injury."(*Id.* at 30).

He summarized the basis of his causation findings in this way:

> He previously was not symptomatic.  Presuming that history was accurate, there are no studies that I know of prior to that time that compare to.  So based upon a negative history, no previous studies, subsequently documented changes following the event that match the mechanism of injury reported to have occurred at that event, it would be most likely related to his fall at the local merchandise store. . . .
>         . . . .
> His symptoms were on the right side.  The MRI documented a change in the cervical spine on the right side.  The level of his symptoms matched the level of the change neurologically on the right side.  So the symptoms and the documented objective findings correlated well.  It also correlated well, best of my recollection, with the EMG/NCV study dated 12-20-2007 because his changes on the MRI were at disc level C5-6 and his EMG/NCV changes were on the right at C6.

*Id.* at 31-32.

From this summary, the Court can conclude that Myers considered sufficient data to support his causation opinion:  as Woodard=s treating physician, he examined him on several occasions, took a careful medical history, ordered routine medical tests, and relied on the test reports as authorized by Fed. R. Evid. 703.  Also, based on the description of how he formed his opinions, the Court finds that he used a reliable method. (See Myers=s further explanation on anatomical considerations of the source of Woodard=s pain).  (Myers depo. p. 48).

The real question in this case turns on what Myers is really saying when he offers these opinions.  In other words, is his testimony sufficient to be probative?  Do they help the trier of fact?  Hence, Wal-Mart raises the objection that Myers did not testify to a reasonable degree of medical certainty about his causation opinions, which the record clearly shows.

In analyzing his testimony on this important issue, it comes to this:  although Myers testified that he was not willing to say within a reasonable degree of medical certainty that the fall caused Woodard=s neck injury, he does say that the Apreponderance of the evidence available in our record is such that it supports that [conclusion]. . . .@ (*Id.* at 73).  And on the last page of his deposition, Woodard=s lawyer asked this question: ABased on a history of him having no reported neck problems at your practice for five months and then beginning with the fall having reports of neck problems, does that make it *more likely than not* in your opinion that the fall caused the neck problems?@ *(Id.)*(emphasis added). To which Myers responded: AIf the history is true, correct.@(*Id.* at 73-74).

Myers then went on to admit that information about previous complaints of neck problems and other treatments and studies would possibly be important on the causation question.  But as he explained, AI said possibly because I don=t know if the information would be useful or not because I don=t know what the information is.@

*Id.* at 40-41.  The Court will consider this testimony and other opinions expressed in Myers=s deposition and assess them using the factors or tests that the Court thinks are appropriate for this case.

If the Court used the tests or factors outlined in *Daubert*, Dr. Myers would fail all of them but one.  As this Court explained in an earlier case, Athe *Daubert* tests generally fit better in cases involving strictly scientific questions, rather than for the medical questions in this case.  Simply because an expert fails all or most of these tests in a medical question case does not result in the exclusion of his testimony.@ *Clarke v. Schofield*, 632 F. Supp. 2d 1350, 1362 (M.D. Ga. 2009). They generally do not help in routine medical cases involving injuries commonly claimed in slip and fall cases and road wreck cases.  (See *McClain v. Metabolife*, 401 F.3d 1233 (11th Cir. 2005) for medical causation testimony given by treating physicians that was not routine and that was excluded.)

### *Daubert* Tests

The  first  *Daubert*  test  focuses  on  testability.   As  the  court  explained, A[s]cientific methodology today is based on generating hypotheses and testing them to see if they can be falsified. . . . The statements constituting a scientific explanation must be capable of empirical test. . . . The criterion of the scientific status of a theory

is its falsifiability, or refutability, or testability."*Daubert*, 509 U.S. 593.   If we assume
that Dr. Myers's medical opinion on causation is a hypothesis, and we know the
treatment that Myers gave Woodard, and how he arrived at the opinion, then the
"hypothesis"is testable.  We have all that information.  So another doctor can take
the patient's medical history, examine him, study the X-rays, CT scans and MRI
scans and can affirm or refute Myers's opinions.   Thus, Myers passes this test
because he gave an opinion with enough specificity that another doctor can agree
with it or refute it.

The next *Daubert* test "is whether or not the theory or technique has been
subjected to peer review and publication."*Id.*   Medical journals do not publish
routine causation opinions  made in routine cases arising out of a routine slip and fall
case.  Likewise, peer review committees do not review such opinions either.

As for the third test, medical doctors testifying in routine tort cases do not
offer error rates and are not called on to offer such rates in or out of court.  Finally,
and on the fourth test, such opinions never reach the view of the scientific
community to have general acceptance.  They are for the courts and have little if any
effect on improving medical care and treatment of patients.

**Advisory Committee Notes Factors**

In routine medical question cases, the Court usually finds the factors outlined in the advisory committee notes more helpful.  The Court finds that Myers scores five out of five using this scale.  We will work through these one at a time.

**1) Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying.**

In this case, Myers was already treating Woodard for another injury suffered before the fall in Wal-Mart.  Logically, Woodard sought Myers's medical care for the new injury.  Myers's care arose naturally out of his usual medical practice, independent of the litigation.  He was not a hired-gun expert, nor did Woodard's counsel refer Woodard to Myers.  This is important in distinguishing this Court's ruling in two previous cases, *Bowers v. Norfolk Southern Corp.*, 537 F. Supp. 2d 1343 (M.D. Ga. 2007) and *Clarke v. Schofield*, 632 F. Supp. 2d 1350 (M.D. Ga. 2009).  So, although Myers gave his opinions for the litigation, he actually treated Woodard, he gave all that treatment independent of the litigation, and he based his opinions on the treatment.

**2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.**

In analyzing the opinions under this factor, the Court will assume that the accepted premises are the medical findings Myers made after evaluating and treating Woodard.  The

unfounded conclusion is Myers=s opinion that the fall at Wal-Mart more likely than not injured Woodard=s neck.

The Court finds that Myers did not unjustifiably extrapolate his causation opinion. He explained in detail the basis for his conclusions and took great care to limit his opinions in light of the possibility that Woodard could have had a pre-existing condition that might alter the opinion.   Based on the information known to Myers, the Court finds no unjustifiable extrapolation.   A logical continuity exists between the premises and the causation opinion based on Woodard=s history, complaints, and treatment.

**3) Whether the expert has adequately accounted for obvious alternative explanations.**

In this case, this factor turns on the word Aobvious.@   AObvious@ is the question because defense counsel, acting as the thimblerigger, put on a bit of a shell game during Myers=s deposition.   He gave Myers enough information to raise questions about Woodard=s pre-existing conditions as to the cause of the injuries, but he did not give him enough medical history so that Myers might have changed his opinions or had an adequate basis to debunk the alternate explanation.  By palming the complete picture of Woodard=s medical history from Myers, defense counsel cannot now complain that Myers failed to give an obvious alternative explanation.  (As a former thimblerigger myself, the Court is not criticizing defense counsel.)  Myers testified that he did not have enough information about

16

Woodard=s past medical history to know what weight to give it.  He answered these questions fairly and to the best of his ability based on the information he had.  He satisfied this factor.

**4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.**

Dr. Myers treated Woodard for two separate injuries.  He kept two separate charts and billed the two charts separately. His paid consulting work in this case was secondary to his care and treatment of Woodard.  Thus, the Court finds that he was very careful and very professional in diagnosing and treating Woodard and in testifying in this case.  His medical opinion was given long after he referred Woodard to Dr. Stefanis.

**5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.**

Woodard had a medical problem, and Dr. Myers treated him for that problem.  The medical issues in this case clearly come within the field of expertise of a medical doctor who is board-certified in emergency medicine and board-eligible in occupational medicine.  Doctors with Myers=s qualifications are known to reach reliable results in cases like this one.  He satisfies the fifth factor.

The Court thus finds that Myers=s expert testimony has satisfied all five of the factors under the advisory committee notes and one of the *Daubert* factors and that the other

*Daubert* factors do not apply.  Having reached these conclusions, however, the Court further notes that Woodard=s previous medical condition does raise an issue of causation in this case.  So, despite satisfying these factors, the Court observes that Myers=s testimony is shaky, but none the less, it could help the jury determine an important issue in the case, medical causation, assuming they choose to believe him.

As the Supreme Court explained in *Daubert*: AVigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence.@ *Daubert*, 509 U.S. at 596. The Court, therefore, finds that Myers=s testimony assists the trier of fact and that he based his opinions on a reliable methodology.

Finally, the Court will address a key argument in defendant=s motionCthat Myers did not offer his opinions Ato a reasonable degree of medical certainty.@First, the Court will charge the jury in this case that Woodard must prove his case by a preponderance of the evidence.  A preponderance of the evidence standard is a high-sounding phrase that stands for nothing more than Amore likely than not.@ Myers satisfied that burden as noted above. That suffices to send the medical causation issue to the jury.

Second, the Court does not believe that we should require doctors to use legalese to have their opinion admitted into evidence.  AA reasonable degree of medical certainty@is

18

not a medical term.  It is a legal term.  Although it does not serve as precedent and is not binding, the Court finds the Georgia law on a related issue helpful.

In *Anthony v. Chambless*, 231 Ga. App. 657 (1998), the court considered the expert's causation testimony, and the expert's failure to testify to a reasonable degree of medical certainty about causation.  As the court explained: "Although it is not necessary for the Plaintiff's experts to use the *magic words* 'reasonable degree of medical certainty' in describing the defendant's prospect of survival with appropriate treatment, such prospect must be more than a mere chance or speculation." *Id.* at 659. (emphasis added).  Hence magic words are not required. This Court will not require an expert to use magic words, like "to a reasonable degree of medical certainty," when the expert's testimony otherwise satisfies the quantum of evidence necessary to make a jury issue on causation.

Eleventh Circuit authority does offer precedent to support this approach. For example, this practice is confirmed in *Allison v. McGhan Medical Corp.*, 184 F.3d 1300 (11th Cir. 1999).  In that case, the court explained that "the standard of proof in a civil case is preponderance of the evidence and that 'reasonable medical probability' is the functional equivalent of preponderance of the evidence." *Id.* at 1320.  Dr. Myers's opinions satisfy the preponderance of the evidence standard as being more likely than not.  As such, his opinions are admissible.

**Analysis of Dr. Stefanis's Opinions on Causation**

Having ruled on Dr. Myers's opinions, the Court will now address Dr. Stefanis's opinions. The Court finds very little difference in ruling on the opinions of these two experts—both of whom treated Woodard—so this analysis will be much shorter.

First, Stefanis is a board-certified, Emory-trained neurosurgeon who has practiced neurosurgery in Macon for many years. His training and experience qualify him to offer medical causation opinions in this case.

Woodard was referred to Dr. Stefanis because of his training and experience. Dr. Myers referred Woodard to Stefanis as a part of Myers's routine medical practice. No attorney referred Woodard to Stefanis.

Stefanis saw Woodard on May 13, 2008, took a history, performed a physical examination, and assessed the patient. The history reflects that Woodard had fallen at Wal-Mart on his outstretched right arm and shoulder. Woodard complained of severe pain in his neck radiating into the right shoulder and going down into his right arm. He also had numbness in his index and middle finger.

On May 19, Dr. Stefanis performed a myleogram and found a problem at the C5-6 level of Woodard's cervical spine. (Stefanis depo. p. 9). Although he could see a protruding disk from the myleogram, he visualized it much better when he operated on Woodard's neck to fuse the C5-6 disc space. (*Id.* at 13).

Dr. Stefanis testified that he saw a combination of both arthritis and a protruding disc at this level.  (*Id.* at 12). He also found a problem with the disc at the level above the C5-6 disc space and also performed a fusion at that level. (*Id.*)  What Stefanis learned and observed while treating Woodard supplied adequate data for him to offer expert opinions in this case.

The Court will not readdress the tests and factors outlined in *Daubert* in analyzing Dr. Stefanis's opinions because they work out the same as with Dr. Myers.  Dr. Stefanis followed standard medical techniques and practices, including diagnostic tests, to reach his expert opinions.  His opinions are testable for the same reason that Dr. Myers's are testible, so he passes the first *Daubert* test.  He fails the other tests, which the Court has already explained do not apply well in cases involving routine medical problems arising from road wrecks and premises liability claims.  Now the Court will evaluate Stefanis's testimony using the very helpful factors outlined in the advisory committee notes.

**1) Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinions expressly for purposes of testifying.**

Dr. Stefanis saw Woodard on referral from another local doctor, he examined Woodard and operated on him.  Stefanis's opinions grew naturally and directly out of treating Woodard and not in anticipation of litigation.

21

**2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.**

Dr. Stefanis did not unjustifiably extrapolate from an accepted premise or premises to an unfounded conclusion.  He concluded that Woodard's fall at Wal-Mart caused or contributed to the injuries for which Stefanis treated him.  On cross examination, Stefanis offered a full explanation for how he determined that the fall caused the injuries based on Woodard's history, Stefanis's physical findings, and the results of diagnostic testing.  He offered a logical, coherent, step-by-step analysis for his opinions.  He followed techniques and practices normally employed by the medical profession in cases like this one.  His method was reliable and his opinions well-founded.

**3) Whether the expert has adequately accounted for obvious alternative explanations.**

Defense counsel thoroughly cross-examined Stefanis about the possibility that a pre-existing condition could explain Woodard's injuries rather than the fall.  Stefanis offered straightforward answers to all questions.  Without going into all of his answers, the Court will only mention three.

First, Stefanis testified that a delay of several weeks between Woodard's fall and onset of symptoms could be explained by the fact that although the  nerve was injured, the

patient did not start having symptoms right away because it takes time for the nerve to swell and cause pain. (Stefanis depo. p. 21).

Second, Dr. Barnes, an orthopedist, had operated on Woodard's shoulder only a few weeks before the fall, and the drugs that Barnes gave him could have masked the symptoms from the neck injury. *(Id.)*

Third, Stefanis based his opinions that Woodard's injury was acute, and therefore as a result of fall, rather than chronic because of what the EMG report showed and did not show.  He explained that electromyography will often show if the pain is chronic, and it did not in this case.  That supported his opinion that the injury was acute and therefore from the fall, as opposed to chronic and therefore from a degenerative process. *(Id.* at 27).

**4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.**

Everything about Dr. Stefanis's approach to treating Woodard appears routine, as do his opinions.  He was not being paid in this case for outside litigation consulting, as that term is commonly understood.  He was a treating surgeon, and Woodard's counsel offered him as an expert witness on medical causation.   Had he not treated Woodard, and especially if Woodard's counsel had referred Woodard to Stefanis only seeking causation testimony, the Court would scrutinize this factor much more closely.

**5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.**

Dr. Stefanis is a highly trained, highly experienced neurosurgeon, and he treated and operated on Woodard.  Neurosurgeons commonly perform cervical fusions and routinely give opinions like those Dr. Stefanis gave in this case.  He satisfies the fifth test.

The Court also finds that Dr. Stefanis's opinions and Dr. Myers's opinions assist the trier of fact to decide the question of medical causation in this case.  The opinions fit the case, and again, are the routine opinions that the Court would expect in a case like this.

In analyzing the opinions of both doctors in this case, the Court has explained that the injuries Woodard sustained are common injuries that arise from road wreck and premises liability cases.  The Court also believes that Woodard was treated in routine fashion by both doctors based on their specialty.

## Conclusion

Upon due consideration of the arguments of counsel, the relevant legal authorities, and the evidence in the record of the case, and for the reasons set forth above, the Court finds that the expert opinions of both of Woodard's expert witnesses satisfy the requirements of Fed. R. Evid. 702 and should be admitted at trial.  Defendant's motions to exclude their testimony [Docs. 27 & 28] are therefore **DENIED**.

**SO ORDERED**, this 25th day of August, 2011.


S/  C. Ashley Royal
C. ASHLEY ROYAL,
UNITED STATES DISTRICT JUDGE